# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-00175-SCT

*CHARLES RAY CRAWFORD a/k/a CHUCK*
*CRAWFORD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/1993 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| TRIAL COURT ATTORNEYS: | DAVID O. BELL |
| | JAMES W. PANNELL |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES RAY CRAWFORD (PRO SE) |
| | GLENN S. SWARTZFAGER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEPHANIE BRELAND WOOD |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/27/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     Charles Ray Crawford appeals from his 1993 conviction for rape, raising numerous assignments of error. The record is unclear as to what caused the delay in this case being heard on appeal. For this reason, we decided to set aside the procedural bar in this matter and consider the merits of Crawford's claimed errors. Having carefully reviewed this record, we have concluded that there is no merit in any of Crawford's assignments of error. Only four issues warrant discussion:

I. **WHETHER THE TWENTY-ONE-YEAR DELAY IN THIS APPEAL VIOLATES CRAWFORD'S DUE PROCESS RIGHTS UNDER THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS.**

II. **WHETHER CRAWFORD WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN HE WAS CONSTRUCTIVELY LEFT WITHOUT COUNSEL DURING A CRITICAL STAGE OF THE PROCEEDINGS AGAINST HIM.**

III. **WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN, OVER CRAWFORD'S OBJECTION, IT GAVE A JURY INSTRUCTION THAT IMPROPERLY SHIFTED THE BURDEN OF PROOF IN VIOLATION OF CRAWFORD'S CONSTITUTIONAL RIGHTS.**

IV. **WHETHER CRAWFORD'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY A SEARCH OF HIS HOME BY LAW-ENFORCEMENT OFFICIALS WITHOUT A WARRANT.**

## FACTS AND PROCEDURAL HISTORY

¶2. On April 13, 1991, seventeen-year-old Sue[1] was riding around Walnut, Mississippi, with her friend Nicole. The girls were in Nicole's grandfather's car. The girls had been told to put fluid in the car and had purchased what was needed. They saw Charles Ray Crawford in the Twin Oaks parking lot and went over to ask if he would help them put fluid in the car. Crawford had his young son with him at the time. Crawford agreed to help and told the girls to drive over to the ballpark. They did, and Crawford met them there. While putting fluid in the car, Crawford told Sue that he needed to talk to her about something but refused to say what it was about.

---

[1] Sue is a pseudonym adopted to protect the identity of the underage rape victim.

2

¶3.  Later that evening, as the girls continued to drive around, they spotted Crawford. They flashed their lights to pull him over.  Sue asked Crawford what he wanted to talk to her about.  Crawford told her they needed to get out of Walnut to talk because his ex-wife Gail might find out he was talking to her and stop him from seeing his son.[2]  Crawford told them to meet him at Chalybeate Cemetery.

¶4.  After finding Crawford parked at the cemetery, the girls pulled up their car beside his truck and rolled down the window.  Crawford, who no longer had his son with him, told Sue to get in the truck so they could talk.  Sue did and Crawford told her that her boyfriend had pictures of Sue that were "pretty bad."  Crawford also told her that he had gotten the pictures from her boyfriend and planned to get rid of them.  Sue told Crawford  she wanted the pictures.  Crawford replied that the pictures were at his house and she should tell Nicole they needed to ride to his house.  Sue and Nicole then got in Crawford's truck, and he drove them to his house.

¶5.  As they drove by the school, Crawford asked the girls to "scrunch down" in the truck so no one would see them.  Crawford then parked by a nearby abandoned house instead of parking at his house.  When they parked, Crawford told Nicole to stay in the car and told Sue to walk with him to his house.  When Sue and Crawford got inside the back door of the house, Crawford stopped and told Sue to stay there so he could make sure nobody was home.

---

[2] Sue is Crawford's ex-sister-law.  Crawford was married to Sue's older sister, Janet Roberts.  Janet and Crawford divorced and he remarried a woman named Gail Thompson. After having a son together, they also divorced.  In April 1991, Crawford began seeing Janet again.

3

Sue saw him walking through the house. When Crawford returned, he pulled a gun and put it to Sue's head.

¶6. Crawford told her to do what he said and not to yell and no one would get hurt. He told Sue to get on the floor. As she did, she asked why he was doing this. Crawford told her to shut up. He taped her mouth shut with duct tape. He then told her to put her hands behind her back. When she did, Crawford taped her hands together.

¶7. Crawford pulled Sue up and led her through the kitchen into a bedroom. Crawford lay Sue on the bed and began removing her shoes. Sue loosened the tape on her mouth by licking it with her tongue so she could speak. Sue told Crawford he could not touch her because she was on her period. Crawford told her he would take care of it. Crawford pulled her pants and panties off then removed her tampon. He then engaged in sexual intercourse with her.

¶8. Afterwards, Sue asked Crawford not to hurt Nicole. Crawford told her not to move and went outside. Sue heard a noise then heard Crawford come back inside the house. Crawford ran into the bedroom and said somebody was there. Crawford grabbed Sue up and they ran out of the house. As they ran out, Crawford said, "What have I done? We've got to get out of here. Somebody is here."

¶9. When they got back to the truck, Sue did not see Nicole, but she did see a hammer. Sue asked Crawford where Nicole was and Crawford responded that he had hit Nicole and she had run away. Crawford then looked at Sue and said, "What have I done? Janet is going to hate me." Sue responded by saying "please don't hurt me."

4

¶10. Crawford and Sue walked back toward Crawford's house, and he untaped her. Sue was able to pull her clothes back on as they got back to the house. Crawford then handed Sue the gun and told her to shoot him. Sue told him that she could not do it. Crawford then said that he needed to see Janet. Crawford asked her to go to Memphis, Tennessee with him to see Janet. Sue agreed to go because she was worried he might hurt her or her sister if she did not.

¶11. Sue and Crawford got back in Crawford's truck and began driving on back roads toward Memphis. On the way, they stopped at Barry King's house and Crawford asked to borrow his car because he knew the law would be looking for him. King refused but told Crawford to go ask Jackie Brooks if he could borrow his vehicle. Crawford and Sue drove to Brooks's house and Crawford asked Jackie to borrow his truck because he was running from the law. Brooks refused to allow him to borrow his truck but did agree to drive him to Memphis. Brooks told Crawford to park his truck behind his house. Brooks and his wife then drove Crawford and Sue to Memphis. There, they dropped Crawford and Sue off at Timmy Joiner's house and returned home.

¶12. Joiner, a friend of Crawford's, drove Crawford and Sue to a nearby Budget Inn and secured a room for them. Joiner left the two of them in the room and went back to his house. Crawford asked Sue if she was scared. When she said she was, Crawford responded that she should not be. Sue asked to talk to Janet, and Crawford began crying and saying he was sorry. Crawford slept on the foot of Sue's bed holding her foot so she could not get away.

¶13. The next day, Joiner picked up Crawford and Sue and they drove to a few different convenience stores where Crawford tried to use the phone. Crawford finally told Joiner to pull over somewhere so he could think. They pulled down a little road and stopped. Crawford began saying he was going to kill himself. Joiner calmed him down, and Crawford told Joiner to take Sue to call Janet.

¶14. Joiner and Sue then left Crawford where he was and drove to a pay phone. Sue talked to Janet and told her that Crawford had raped her. Janet asked to speak to Joiner again. When Joiner got off the phone with Janet, he said that he did not understand what was going on but that Janet had told him to tell Crawford to turn himself in to the police. Sue cried as they drove back to where they left Crawford, and Joiner told Crawford that Janet said he should turn himself in to the police.

¶15. Joiner then drove Crawford to a convenience store where Crawford dialed 911 and turned himself in to police. Joiner drove Sue to meet Janet. Sue was taken to a local hospital, and a rape kit and hair samples were taken.

¶16. Meanwhile, Deputy Greg Hopper, Chief Deputy Tommy Story, and other officers from the Tippah County Sheriff's Department responded to a call that someone had been hit in the head. They arrived at Crawford's grandparents' house and found Nicole lying on a stretcher. Nicole told the officers that Sue needed help and that she was at Crawford's house.

¶17. The deputies then went to Crawford's house. They knocked and yelled, but no one answered the door. Deputies found no one inside the house but did find a used tampon in the bedroom, a roll of duct tape with hair on the kitchen table, and a strip of duct tape with hair

6

inside the house. The back door was open and the deputies saw blood on the stairs. They also saw footprints in the garden and followed them to a nearby abandoned house. Outside they found more duct tape with hair. Relatives gave the deputies a description of Crawford's truck and an all points bulletin (APB) was sent out.

¶18. Later, deputies located Crawford's truck behind Brooks's residence. The Memphis Police Department recovered a .22 caliber R&G revolver and apprehended Crawford. The hair found on the roll of duct tape and various pieces of duct tape found in and outside of Crawford's residence were compared with known samples of Sue's hair and Crawford's hair. Some hair on the tape matched Sue's known hair samples and some matched Crawford's known hair samples.

¶19. Crawford was indicted by the Tippah County Grand Jury for the kidnap and rape of Sue (cause number 5780)–the case now before us. Crawford also was separately indicted for aggravated assault of Nicole (cause number 5779). Both cases eventually were tried separately in Chickasaw County, after the trial court granted Crawford's motion for a change of venue.

¶20. Prior to both trials, Crawford indicated that he planned to pursue an insanity defense. Crawford was thereafter evaluated and examined by multiple mental-health professionals.

¶21. On January 30, 1993, three days before the trial for the aggravated-assault charge was set to begin, Crawford was arrested for the murder of Kristy D. Ray while engaged in the crime of kidnapping, burglary of an occupied dwelling, rape, and sexual battery. The crimes

occurred on January 29, 1993. Crawford ultimately was convicted of capital murder and sentenced to death. *See **Crawford v. State***, 716 So. 2d 1028 (Miss. 1998).

¶22. On February 1, 1993, during a pretrial hearing the morning before the aggravated-assault case was set to start, the State moved for a competency evaluation under then Uniform Rule of Circuit and County Court 4.08. William Fortier, Crawford's trial counsel at the time for both the aggravated-assault case and the instant case, responded to the motion, stating:

> Your Honor, we have consented to the motion by the State for a psychiatric evaluation to determine whether or not Mr. Crawford is able to stand trial at this time. I think there is a serious question as to his ability to stand trial on these charges based on the acts that have come to light over the weekend; and, therefore, we agreed with the motion; and we have approved the order submitted to the court for the psychiatric evaluation.

¶23. The trial court responded, noting first for the record that it previously had ordered that Crawford be examined at the Mississippi State Hospital at Whitfield to determine his mental ability to stand trial. A report was issued by the State Hospital on December 23, 1992, concerning Crawford's mental health. Doctors there had concluded, based on psychiatric examinations they had conducted on Crawford, that Crawford was legally competent to stand trial. The trial court then ordered another psychiatric evaluation be conducted, finding that, based on the present circumstances, reasonable grounds existed to believe that Crawford might be incompetent to stand trial. The court noted for the record that it was ordering the psychiatric evaluation on the court's own motion.

¶24. That same day, Fortier submitted a motion to withdraw as counsel. The trial court stayed the motion and continued all other motions and the scheduled aggravated-assault trial

8

until another psychiatric examination of Crawford was conducted. Three days later, the trial court granted Fortier's motion to withdraw, and James Pannell was appointed as Crawford's counsel.

¶25. Meanwhile, Crawford was evaluated at the Mississippi State Hospital on February 2, 1993, by Dr. Reb McMichael and Dr. Criss Lott. A competency hearing was held on February 11, 1993, to determine Crawford's competence to stand trial in both cases. The record indicates that, prior to the hearing, both doctors briefly evaluated Crawford at the courthouse and that Pannell was present during the interview(s). During the hearing, Pannell cross-examined both doctors as to Crawford's competency to stand trial. Pannell also questioned both doctors about what medical signs he (Pannell) should be aware of while representing and preparing Crawford for trial that might indicate to him (Pannell) that Crawford is "slipping out of competency." Following the hearing, the trial court issued an order finding Crawford competent to stand trial.

¶26. Crawford stood trial for the aggravated-assault charge on May 18, 1993. The rape and kidnapping charge was brought to trial on August 3, 1993.

¶27. Prior to the aggravated-assault trial, a motion was entered on March 16, 1993, for further psychiatric evaluation of Crawford; the record does not disclose who requested the evaluation. In May 1993, Crawford through his counsel Pannell, submitted a motion for a competency evaluation in the aggravated-assault case. On the day the aggravated-assault trial began, a pretrial competency hearing was conducted, after which the trial court found Crawford competent to stand trial. Crawford was found guilty of aggravated assault in that

9

proceeding and was sentenced to twenty years in the custody of the Mississippi Department of Corrections. No post-trial motions were filed at that time, and no appeal was taken. *See Crawford v. State*, 787 So. 2d 1236, 1238 (Miss. 2001). On March 11, 1996, Crawford filed a pro se motion for appointment of counsel, but he did not pursue that motion. *Id*. In 1998, David Bell (who was appointed co-counsel with Pannell in Crawford's capital-murder case) filed, on behalf of Crawford, a motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial. *Id*. In the motion, Bell stated that Crawford had sought new counsel, and he (Bell) was appointed. Bell requested that the motion be considered *nunc pro tunc*. *Id*. The trial court found the motion for a new trial was not timely and was not properly before the circuit court. *Id*. The trial court, however, at Crawford's request and over the State's objection, considered the motion for JNOV or new trial as if it had been timely filed. *Id*. at 1239. After hearing arguments on the motion, the trial court found no grounds which warranted granting JNOV or a new trial and denied the motion. *Id*. Crawford then appealed to this Court, which affirmed Crawford's conviction and sentence. *Id*. at 1249.

¶28. Meanwhile, the instant case was brought to trial on August 3, 1993. At trial, Crawford called his mother and ex-wife Gail Thompson to testify about spells of mental illness Crawford had experienced throughout his life and about Crawford's stays in mental hospitals. Crawford also called Jackie Brooks and Brooks's wife, Tammy. Both testified that when Crawford and Sue were with them in Brooks's truck, they appeared to be boyfriend and girlfriend and that Sue never indicated she had been raped. Crawford also testified at

trial. His testimony indicated that he had no memory of the incident. When asked if he raped Sue, Crawford responded:

> I can't honestly say that I didn't, and I can't sit here and tell you that I did. The only thing that I've got to go by is what she said. I'm not going to lie and say I didn't, and I'm not going to turn around and lie and say that I did, because I don't know.

The State then presented two rebuttal witnesses. Dr. Stanley Russell, who had been seeing Crawford in prison while awaiting trial, testified that his diagnosis of Crawford was adjustment disorder with depressed mood and a personality disorder. Both disorders, according to Dr. Russell, were psychiatric disorders and "do not deviate [Crawford's] responsibility for behavior." Dr. McMichael, who had evaluated Crawford twice for the purpose of conducting a sanity evaluation of Crawford and determining Crawford's competency to stand trial, also testified. Dr. McMichael testified that Crawford was malingering or faking or exaggerating his memory loss. He also diagnosed Crawford with a personality disorder and noted Crawford's past struggles with cocaine abuse, alcohol abuse, and marijuana abuse. Dr. McMichael testified that "none of these diagnoses would rise to the level of something that would cause [Crawford] truly not to know what he's doing."

¶29. On August 6, 1993, Crawford's jury found him guilty of rape and not guilty of kidnapping. The trial court sentenced Crawford to forty-six years in the custody of the Mississippi Department of Corrections for the rape conviction. Crawford's trial counsel did not file any post-trial motions in the instant case, nor did he file a notice of appeal.

¶30. On September 23, 1993, Crawford was indicted by the Tippah County Grand Jury for capital murder for the killing of Kristy D. Ray. As mentioned, Bell was appointed co-counsel

11

with Pannell in the capital-murder case. Venue changed in that case from Tippah County to the Circuit Court of Lafayette County, Mississippi. The capital-murder case went to trial on April 18, 1994. Crawford was found guilty on all counts, and Crawford was sentenced to death on April 23, 1994. Bell, Crawford's co-counsel in the capital-murder case, represented Crawford on appeal in that case. This Court affirmed Crawford's capital-murder conviction and death sentence on appeal. *See* **Crawford v. State**, 716 So. 2d at1053, *superseded on other grounds by* **Miss. Transp. Comm'n v. McLemore**, 863 So. 2d 31 (Miss. 2003).

¶31.    In April 1995, Crawford sent a letter to the Chickasaw County Circuit Clerk, asking when his notice of appeal was filed in the instant case. The circuit clerk responded that the record had been transferred to Tippah County, and that she had forwarded Crawford's letter to the Tippah County Circuit Clerk. In January 1996, Crawford sent a letter to Judge Kenneth Coleman, who had presided over all three cases, asking for counsel to pursue an appeal. On March 27, 1996, Judge Coleman appointed Bell to pursue Crawford's appeal in the instant case.

¶32.    Bell requested the trial transcript in July 1996. In September 1998, Bell moved for JNOV or for a new trial, which Judge Coleman denied on October 13, 1998. Bell filed a notice of appeal on November 9, 1998, and designated the record on November 25, 1998. Crawford was granted leave to proceed in forma pauperis November 30, 1998. The record is silent as to why the appeal was never docketed with this Court.

¶33.    By an order entered February 2, 2002, Thomas Levidiotis was appointed by the trial court in place of Bell. Levidiotis made inquiry with this Court regarding the status of the

appeal in this case, but the record does not reflect that anything else was done in furtherance of the appeal.

¶34. Crawford's present appellate counsel made an entry of appearance on January 7, 2014.[3] Present counsel then filed an amended and corrected notice of appeal and an amended and corrected designation of record. The case was submitted for our review of the issues on March 23, 2015.

¶35. Additional facts, as necessary, will be related in our discussion.

## I. THE TWENTY-ONE-YEAR DELAY IN THIS APPEAL VIOLATES CRAWFORD'S DUE-PROCESS RIGHTS UNDER THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS.

¶36. Crawford contends that the twenty-one-year delay for his appeal in this case to be heard has denied him due process of law. We disagree.

¶37. The record does not disclose why an appeal was not filed with this Court until now, which Crawford's current appellate counsel acknowledges. Counsel asserts, however, that Crawford is not to blame. We do not know that to be the case from the record before us.

¶38. Neither the United States Supreme Court nor this Court has extended a criminal defendant's constitutional right to a speedy trial to the appellate context. *See Hayes v. Ayers*, 632 F.3d 500, 523 (9th Cir. 2011) ("No Supreme Court decision 'squarely addresses' the right to a speedy appeal, nor does the right to a speedy trial 'clearly extend' to the appellate

---

[3] On December 16, 2013, the circuit court entered an order appointing the Office of the State Public Defender, Indigent Appeals Division, to represent Crawford in this appeal. The Public Defender's Office determined that it had a conflict in this case, and therefore contracted with the undersigned counsel under the provisions of Mississippi Code Section 99-40-1(2) to represent Crawford in the appeal of this matter.

13

context.") (quoting *Wright v. Van Patten*, 552 U.S. 120, 123, 125, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008)); *Kolberg v. State*, 704 So. 2d 1307, 1320 (Miss. 1997) ("The remedy for denial of a speedy appeal is not clear since this Court has never recognized such a right and does not do so now."). In certain circumstances, due process concepts may become implicated when substantial delays during the criminal appellate process occur. *Lanier v. State*, 684 So. 2d 93, 98 (Miss. 1996). This is rare, however. And we stress that, unlike in a criminal trial, where the State bears the responsibility of bringing a criminal defendant to trial, the same burden does not lie with criminal appeals. As a matter of course, criminal defendants carry responsibility for submitting an appeal. And we are loathe to set aside time-limit requirements–fundamental in their own respect–in cases where that responsibility is eschewed. Again, we do not know that to be the case here. Accordingly, we have decided to hear Crawford's appeal. We remain adamant, though, that denial of a speedy appeal is not reversible error on its own in this state. *Haynes v. State*, 584 So. 2d 432, 433 (Miss. 1991). And where no other reversible error exists, reversal on the grounds of a denial of a speedy appeal is inappropriate. *Lanier*, 684 So. 2d at 100 (citing *Haynes*, 584 So. 2d at 433).

¶39. We find that to be the case here. As mentioned, we have thoroughly reviewed the record in this case and find no merit in any of the ten assignments of error Crawford raises in this appeal. We find only four of these issues warrant discussion. Having addressed the previous issue, we now proceed to the remaining three.

II. **WHETHER CRAWFORD WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN HE WAS CONSTRUCTIVELY LEFT WITHOUT COUNSEL DURING A CRITICAL STAGE OF THE PROCEEDINGS AGAINST HIM.**

14

¶40. At the outset, both the Fifth Circuit Court of Appeals and the United States District Court for the Northern District of Mississippi addressed this matter in Crawford's federal habeas corpus petition concerning his capital-murder conviction. In denying Crawford habeas relief, both courts found that, while the February 2, 1993, competency evaluation was conducted in violation of Crawford's Sixth Amendment right to counsel, with respect to the capital-murder charge, the error was harmless. *See, respectively*, **Crawford v. Epps**, No. 3:04–cv–00059, 2012 WL 3777024 (N.D. Miss. Aug. 29, 2012), and **Crawford v. Epps**, 531 Fed. Appx. 511 (5th Cir. 2013). In our discussion of this issue, we relate some of the federal district court's and the Fifth Circuit's findings, based upon extensive discovery conducted by the district court in the matter.

¶41. On January 29, 1993, the day Kristy D. Ray (the victim in the capital-murder case) was reported missing from her parents' home, Crawford's family members found a ransom note in their attic and contacted Fortier. Crawford was out on bond from the aggravated-assault and rape charges at the time of Kristy's disappearance. As mentioned, Crawford was scheduled to stand trial on the aggravated-assault charge on February 2, 1993. Crawford previously had filed a notice of his intent to pursue an insanity defense in both the aggravated-assault and rape cases, and he had submitted to a psychiatric examination at the Mississippi State Hospital on December 23, 1992. The December evaluation was conducted by Drs. Lott and McMichael, and both doctors concluded that Crawford was malingering as to memory deficits, that he knew right from wrong, and that he was competent to stand trial.

15

¶42. After receiving the ransom note and becoming fearful of what Crawford might do, Fortier contacted law-enforcement officials. Crawford was located and arrested on January 30, 1993, a Saturday. Prior to questioning by law-enforcement officials, Crawford waived his right to counsel. Crawford subsequently confessed involvement in Kristy's disappearance and led officials to her body. Crawford gave additional statements to law-enforcement officials on February 1 and February 2, 1993. Warrants issued for his arrest on capital-murder and related charges on Monday, February 1, 1993.

¶43. Because of his participation in the events leading to Crawford's arrest for Kristy's murder, Fortier moved to withdraw as counsel in the aggravated-assault and rape cases on February 1, 1993. Fortier asserted that he was operating under a conflict of interest and there existed "no way that he c[ould] set aside his prejudiced feelings" and properly represent Crawford due to his belief that Crawford's involvement in Kristy's murder was "coldhearted, calculated, and premeditated."

¶44. Before ruling on the motion, Judge Coleman held a hearing on February 1, 1993, without Crawford present. Following the hearing, Judge Coleman ordered the immediate examination of Crawford by the Forensic Services Unit of the Mississippi State Hospital in order to "proceed to trial" in the aggravated-assault and rape cases. Judge Coleman ordered the examiners to produce a report determining whether Crawford was "sane and competent to stand trial." Fortier did not speak to Crawford prior to the psychiatric evaluation.

¶45. The psychiatric evaluation was conducted on February 2, 1993. Prior to the evaluation, physicians advised Crawford as to the nonconfidential nature of the examination,

and of his *Miranda* rights.[4] *Crawford*, 531 Fed. Appx. at 517; *Crawford v. Epps*, 2008 WL 4419347, *13 (N.D. Miss. Sept. 25, 2008), *vacated in part by Crawford v. Epps*, 353 Fed. Appx. 977, 994 (5th Cir. 2009) (with instructions to develop the record, if necessary, and reconsider the merits of Crawford's Sixth Amendment claim.)

¶46.    In addressing Crawford's habeas claim after remand, both the district court and the Fifth Circuit found that Crawford was without counsel in the capital-murder case.  Fortier had been retained by Crawford in both the aggravated-assault and rape cases, but not in the capital murder case.  *Crawford*, 531 Fed. Appx. at 517-18.  The Fifth Circuit reiterated that the Sixth Amendment is offense-specific and is not waived merely because the defendant employs a defense of mental incapacity.  *Id*. (citations omitted).  According to the Fifth Circuit, "[b]ecause Fortier was not retained to represent Crawford in the capital murder charge and, in any event, had filed a motion to withdraw altogether, there was no counsel who could be 'notified in advance' about the scope of the examination, and no counsel to assist Crawford 'in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed.'" *Id*. at 518 (*quoting Estelle v. Smith*, 451 U.S. 454, 471, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981)).  Because Crawford was required to undergo a psychiatric examination on February 2 without the guiding hand of counsel, his Sixth Amendment rights were violated with respect to the capital-murder charge.  *Id*. (citation and quotations omitted).

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed 2d 694 (1966).

17

¶47. The Fifth Circuit explained the law in this area as follows: "[T]here is no Sixth Amendment right to have an attorney present during a psychiatric evaluation." *Id*. at 517 (citing *Estelle*, 451 U.S. at 470 n.14). A criminal defendant, however, has a right to counsel's assistance "in making the significant decision of whether to submit to the psychiatric examination and to what end the psychiatrist's findings could be employed." *Id*. (quoting *Estelle*, 451 U.S. at 471). "Defense counsel must have been given prior notification of the nature and scope of the examination, and an opportunity to consult with the defendant about the uses to which the examination could have been put." *Id*. (citing *Estelle*, 451 U.S. at 471). Quoting the Third Circuit Court of Appeals, the Fifth Circuit related the doctrine as follows:

> Before submitting to a compelled psychiatric interview, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified. The warnings must advise the defendant of the "consequences of foregoing" his right to remain silent . . . . The Fifth–but not Sixth–Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings. . . . However, the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes.

*Id*. (quoting *Gibbs v. Frank*, 387 F.3d 268, 274 (3d Cir. 2004) (footnote and citations omitted)).

¶48. Despite the Sixth Amendment violation that occurred with respect to Crawford's capital-murder charge, the federal courts, as mentioned, found the violation harmless. Both courts determined that the State had presented sufficient evidence to the jury to uphold

Crawford's capital-murder conviction and sentence, and that it did so without the need for the February 2 evaluation. The Fifth Circuit said:

> We agree with the district court that, taking all of the facts into account, the Sixth Amendment violation that occurred as a result of the February 2 evaluation did not have a "substantial and injurious influence or effect" on the verdict. *See* **Brecht** [*v. Abrahamson*], 507 U.S. [619,] 623, 113 S. Ct. 1710 [(1993)]. Drs. Lott and McMichael also examined Crawford in December 1992, and Dr. Lott conducted two additional examinations between the February 2 evaluation and Crawford's capital murder trial while Crawford was represented by counsel. The clinical opinions reached as a result of the February interview were substantially similar to those reported in December 1992, and also conformed with the results of the latter two evaluations (which Dr. McMichael evaluated and reviewed prior to testifying). The doctors consistently found that Crawford was malingering his memory defects, that his claims of incapacity were neither credible nor consistent with his actions at the time of the crime, and that he was a dangerous individual with a history of aggressive behavior.

*Crawford*, 531 Fed. Appx. at 519-20.

¶49. Notably, both the federal district court and the Fifth Circuit opined that "use of the [February 2] evaluation during [either the aggravated assault or rape] trial[s], would not have offended Crawford's Fifth or Sixth Amendment rights." *Id*. (quoting *Crawford*, 353 Fed. Appx. at 982). Both courts found that "[a]t the time Fortier approved the examination, he was acting as counsel to Crawford in his aggravated assault and rape trial[s]. Crawford was advised of his *Miranda* rights by the examining physicians, and he planned to initiate a trial defense of mental incapacity or disturbance." *Id*.

¶50. We agree. As the federal courts found, Crawford had planned to initiate an insanity defense in the rape case and was evaluated by Drs. Lott and McMichael in December 1992. No contention or showing has been made that Crawford was not informed or counseled as

19

to his rights prior to that examination. Indeed, Crawford was specifically warned prior to the February evaluation that the report generated as a result of the examination would be disclosed, and Crawford was reminded "of his right not to say anything which might incriminate him in a court of law." *Crawford*, 2012 WL 3777024, *9. When Fortier signed off on the February 2 competency-evaluation order, he was still acting as counsel to Crawford in his rape charge, irrespective of his pending motion to withdraw from the case. "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." Mississippi Rules of Professional Conduct Rule 1.16. Though, as the federal district court found, Fortier did not speak to Crawford prior to the February 2 evaluation, Crawford was readvised of his *Miranda* rights by physicians and of the nonconfidential nature of the examination. *Crawford*, 2008 WL 4419347, *13.

¶51. Even if we were to disagree with the federal courts and find that the February 2 competency evaluation was conducted in violation of Crawford's Sixth Amendment right to counsel, with respect to the rape charge, we would hold the violation to be harmless–for the same reasons the Fifth Circuit found the constitutional violation, with respect to the capital-murder charge, was harmless. *See, e.g.*, *Satterwhite v. Texas*, 486 U.S. 249, 257, 108 S. Ct 1792, 100 L. Ed. 2d 284 (1988). As the Fifth Circuit found, Drs. Lott and McMichael also examined Crawford in December 1992, and the record before us indicates that at least one additional competency evaluation was conducted between the February 2 evaluation and the rape trial. The clinical opinions reached as a result of the February 2 evaluation were

20

substantially the same as those reported in the other evaluations. Since Crawford was evaluated in December 1992 and was warned that the report generated as a result of the examination would be disclosed, he could have anticipated that testimony would be introduced to rebut his insanity claim were he to pursue an insanity defense. As the Fifth Circuit found, in choosing to pursue an insanity defense, Crawford "made the 'significant decision' regarding the psychiatric evaluation, and cannot complain that he was denied the effective assistance of counsel prior to the examination because he was unable to consult with his attorney as to whether to submit to a psychiatric examination." *Crawford*, 531 Fed. Appx. at 521 (quoting *Vardas v. Estelle*, 715 F.2d 206, 211 (5th Cir. 1983)); *see also* *Rivera v. Collins*, 934 F.2d 658, 661- 62 (5th Cir.1991) ("Once [the defendant] raised an insanity defense, the state had the right to require that [he] be examined by a state psychiatrist outside the presence of his counsel. . . . The relevant consultation between [the defendant] and [his counsel] thus occurred at the time that [the defendant] decided to raise the defense.").

¶52.    Here, there was more than sufficient evidence apart from the results of the February 2 evaluation, upon which the jury could base its verdict that Crawford was guilty of rape. Crawford was aware of this evidence, and he chose to pursue his insanity defense, knowing the evidence would be introduced. *See*, *e.g.*, *Crawford*, 531 Fed. Appx. at 521 (finding same with regard to Crawford's capital-murder conviction and death sentence). We are more than satisfied that the February 2 evaluation, standing alone, did not contribute to the verdict.

¶53.    The dissent authored by Justice Coleman finds that this case must be reversed because there was an actual conflict of interest. We do not.

¶54. The Coleman dissent relies primarily on our decision in *Kiker v. State*, 55 So. 3d 1060 (Miss. 2011), a case which the dissent acknowledges is based on a different conflict. In *Kiker*, we reversed Julius Wesley Kiker's conviction, having found that defense counsel's concurrent representation of the State's witness amounted to an actual conflict of interest that the defendant did not waive. *Id*. at 1067-68. In reaching our holding, we said that:

> When the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of as a matter of law, and "reversal is automatic irrespective of a showing of prejudice unless the accused knowingly and intelligently waived his constitutional right to conflict free representation." *Armstrong v. State*, 573 So. 2d 1329, 1331 (Miss. 1990). Thus, the standard set out in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), requiring a showing of "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," is inapplicable to cases when the defendant's attorney "actively represented conflicting interests." *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2001).

*Kiker*, 55 So. 3d at 1066.

¶55. As the Coleman dissent correctly observes, this is strong rhetoric, which upon further reflection, we now find imprecise.

¶56. Four seminal Supreme Court cases deal with actual conflicts of interest with regard to the Sixth Amendment: *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d

22

426 (1978);[5] ***Cuyler v. Sullivan***, 466 U.S. 355, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980);[6]

***Wood v. Georgia***, 450 U.S. 261, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981);[7] and ***Mickens***,

535 U.S. 162. All of these cases concern a lawyer's conflict of interest solely on

representation of multiple clients. The standard that has emerged dealing with such conflicts

comes from ***Cuyler***, which held that prejudice is presumed when counsel is burdened by an

actual conflict of interest, but only if the defendant can demonstrate that counsel "actively

represented conflicting interests" and that "an actual conflict of interest adversely affected

---

[5] In ***Holloway***, defense counsel representing three codefendants with diverging and potentially conflicting interests moved for the appointment of separate counsel. ***Holloway***, 435 U.S. at 478-80. The ***Holloway*** Court noted that counsel in this situation is effectively gagged from properly representing any one of the defendants, and that it is inherently difficult to measure the degree of harm caused by such conflicts. *Id*. at 489-90. The Court found that this type of conflict undermines the fairness and efficacy of the adversarial process, and that automatic reversal was necessary where defense counsel's objection was denied by the trial court, unless the trial court concludes that there is no conflict. *Id*. at 488.

[6] In ***Cuyler***, the Court addressed the issue of multiple representation where the trial court does not and reasonably should not know of the conflict. ***Cuyler***, 446 U.S. at 345-50. The ***Cuyler*** Court noted that Holloway recognized that "a lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment." *Id*. at 345 (citing ***Holloway***, 435 U.S. at 481-82). The ***Cuyler*** Court further developed the joint-representation conflict standard, stating that, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance," and that a defendant who makes such a showing is not required to show prejudice in order to obtain relief. *Id*. at 348, 349-50.

[7] In ***Wood***, the Court remanded for proceedings to determine whether there was an actual conflict where the defendants' lawyer was being paid by the defendants' employer. ***Wood***, 450 U.S. at 269-72 (employer owned a business purveying obscene material, and the defendants had been convicted in connection with the business). The defendants' employer had been paying the defendants' fines, imposed after their conviction for distributing obscenity. *Id*. at 276. The Court determined that remand was necessary because "petitioners were represented by their employer's lawyer, who may not have pursued their interests single-mindedly." *Id*. at 271-72.

his lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 345-50). This test sets a lower threshold for reversal of a criminal conviction than does the *Strickland* test, which requires the defendant establish that counsel's representation fell below an objective standard of reasonableness and resulted in prejudice. *Strickland*, 466 U.S. at 687-88.

¶57.    The *Strickland* Court explained the reason for this distinction as follows:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S. at 345-350, 100 S. Ct. at 1716-1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.*, Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, *supra*, 446 U.S. at 350, 348, 100 S. Ct. at 1719, 1718 (footnote omitted).

*Strickland*, 466 U.S. at 692.

¶58.    As recognized in *Armstrong*, this Court adopted the *Cuyler* standard in *Stringer v. State*, 485 So. 2d 274 (Miss. 1986), where it held "[i]n order to demonstrate a violation of his Sixth Amendment Rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Armstrong*, 573 So. 2d at 1333.

24

¶59. Like *Holloway*, *Cuyler*, *Wood*, and *Mickens*, the conflict in *Armstrong* concerned multiple representation. The *Armstrong* Court reversed the defendant's conviction because it found that an actual conflict of interest which adversely affected counsel's performance had been demonstrated, and the trial court reasonably should have known this conflict existed but failed to so inform the defendant. *Armstrong*, 573 So. 2d at 1334. Wrongly, at the conclusion of its opinion, the *Armstrong* Court used language that suggested reversal is automatically required only upon a showing that an actual conflict exists in the case. This was a misstatement of Mississippi law. The *Armstrong* Court did not overrule *Stringer*, and it applied the *Cuyler* standard, adopted by *Stringer*, to the case before it.

¶60. Similar to *Armstrong*, *Kiker* also involved a multirepresentation conflict, though, of a different sort. In *Kiker*, one of the defendant's trial counsel was also representing a key witness for the State in another, unrelated criminal case. *Kiker*, 55 So. 3d at 1063. Though we cited *Cuyler*, we made no mention of the *Cuyler* standard. Instead, as mentioned above, we quoted from *Armstrong*, where it was said that, "[w]hen the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law, and 'reversal is automatic irrespective of a showing of prejudice unless the accused knowingly and intelligently waived his constitutional right to conflict free representation.'" *Kiker*, 55 So. 3d at 1066. Even though we did not refer to the *Cuyler* standard, we applied it nonetheless by explaining how the actual conflict of interest affected counsel's performance.

> Barnett owed a duty of loyalty both to Kiker and to [Bobby] Crawford, a duty that was impossible to fulfill if one of his clients was offering testimony

25

against the other. As Crawford's attorney, Barnett had the duty to advise Crawford, who was facing criminal charges of his own, of his right against self-incrimination. Barnett also had the duty to counsel Crawford in his decision of whether to testify against Kiker. On the other hand, as Kiker's attorney, Barnett was charged with attacking Crawford's credibility, which would have included an inquiry into Crawford's criminal background, and his current circumstances, with which Barnett should have been intimately familiar. Barnett could not have acted as a zealous advocate for Kiker without disclosing information about Crawford which he gained as Crawford's lawyer. Likewise, Barnett could not have acted as an advocate for Crawford after seeking, on behalf of Kiker, to undermine Crawford's credibility.

*Kiker*, 55 So. 3d at 1067.

¶61.    In the instant matter, we are not presented with a multiple-representation conflict. Rather, we are faced with a conflict between a lawyer and his client.

¶62.    We point out that in **Beets v. Scott**, 65 F.3d 1258 (5th Cir. 1995), the Fifth Circuit rejected extending the **Cuyler** standard beyond multiple-representation cases and held that the **Strickland** test, rather than the **Cuyler** test, offers superior framework for addressing conflicts outside the multiple-client context. **Beets** reasoned that "in the absence of controlling authority, we must decide whether, when a lawyer places his self-interest above that of the client, the resulting conflict deserves **Cuyler**'s 'not quite per se' rule of prejudice or **Strickland**'s more deferential standard of attorney competence. *Id*. at 1269. **Beets** said that "only in the multiple representation context is the duty of loyalty so plain." *Id*. at 1270. But "[w]here the obligation to a single client is concerned, the duties of loyalty and competence are intertwined." *Id*. at 1270. And when the duty of loyalty is challenged by an attorney's self-interest, the range of possible breaches . . . . is virtually limitless," ranging "from wholly benign to devastating." *Id*. at 1271. Thus, according to **Beets**, "[a]pplying a

26

near-per se rule of prejudice to this spectrum of potential ethical problems is a draconian remedy." *Id*.

¶63. *Beets* concluded that "[i]f *Cuyler*'s more rigid rule applies to attorney breaches of loyalty outside the multiple representation context, *Strickland*'s desirable and necessary uniform standard of constitutional ineffectiveness will be challenged." *Id*. at 1272. What would result would be an "uncertain boundary between *Cuyler* and *Strickland*, [and] the focus of Sixth Amendment claims would tend to shift mischievously from the overall fairness of the criminal proceedings–the goal of 'prejudice' analysis–to slurs on counsel's integrity–the 'conflict' analysis." *Id*.

¶64. Here, we need not decide whether *Cuyler*'s or *Strickland*'s standard should apply to these types of personal conflicts. The one presented to us today fails under both. For reasons already explained, Crawford was not prejudiced by the February 2 evaluation. And there is no showing whatever that the attorney's personal conflict in the matter had any adverse affect on his legal representation of Crawford.

¶65. For these reasons, we find this issue is without merit.

### III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN, OVER CRAWFORD'S OBJECTION, IT GAVE A JURY INSTRUCTION THAT IMPROPERLY SHIFTED THE BURDEN OF PROOF IN VIOLATION OF CRAWFORD'S CONSTITUTIONAL RIGHTS.

¶66. On this issue, we acknowledge that, while jury instruction S-8 mirrors language this Court has used to describe the *M'Naghten*[8] test, the instruction, standing alone, could be

---

[8] *M'Naghten's Case*, 8 Eng. Rep 718, 10 Cl. § F. 200, 1 Car. & Kirw, 130 (H.L. 1843).

confusing on the question of who bears the burden of proof on the issue of insanity. We disagree with Crawford and the dissent authored by Presiding Justice Dickinson, however, that this instruction hopelessly conflicts with jury instruction S-4, which properly informed the jury that the State bears the burden to prove sanity beyond a reasonable doubt.

¶67. This Court has said multiple times that, "In Mississippi to establish the defense of insanity, it must be clearly proved that at the time of committing the act the party accused was laboring under such defect of reason from disease of mind as to not know the nature and quality of the act he was doing or, if he did know it, that he did not know it was wrong." *White v. State*, 542 So. 2d 250, 252 (Miss. 1989) (citing *United States v. McCracken*, 488 F.2d 406 (5th Cir.1974); *Edwards v. State*, 441 So. 2d 84 (Miss.1983); *Palmer v. State*, 427 So. 2d 111 (Miss.1983)). This standard was first announced in the landmark case of *Regina v. M'Naghten*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843), where it was stated that "the jurors ought to be told . . . that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did not know it, that he did not know he was doing what was wrong." *Clark v. Arizona*, 548 U.S. 735, 747, 126 S. Ct. 2709, 165 L. Ed. 2d 842 (2006) (quoting *M'Naghten*, 10 Cl. & Fin at 210, 8 Eng. Rep., at 722).

¶68. Thirty-six years after *M'Naghten*, this Court, in *Cunningham v. State*, 56 Miss. 269 (1879), noted that three theories had since emerged among the courts and legal writers as to who should bear the burden at trial in proving (in)sanity. *Cunningham* explained:

28

Three distinct theories are held by courts and text-writers of the highest character, and each may be supported by a long array of respectable authorities, viz.: 1. The prisoner must prove his insanity beyond a reasonable doubt. 2. He must establish it by a preponderance of evidence. 3. He must raise a reasonable doubt as to his sanity.

The first of these views receives most countenance from English adjudications and text-books; the second is supported by a majority of the American courts; while the third, though held as yet perhaps by a minority of the adjudged cases, is gaining in favor, is the well-settled law in many of the States, and is supported by a power of reasoning which we deem convincing.

*Id*.

¶69. Settling on the third theory, *Cunningham* held as follows:

We think the true rule is this: Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case.

*Id*.

¶70. From *Cunningham*, the rule in Mississippi is that there is a presumption in every criminal case the accused is sane. *White v. State*, 542 So. 2d 250, 252 (Miss. 1989). "Therefore, the burden is initially on the accused to introduce evidence creating a reasonable doubt as to his sanity at the time of the act." *Id*. Once the accused has overcome this initial burden, the burden shifts to the State to present sufficient evidence to prove the accused's sanity beyond a reasonable doubt. *Id*.

¶71. The language contained in jury instruction S-8, "to establish a defense on the ground of insanity, it must be clearly proved . . . ," is, in the context of *White*, *et al.*, actually a legal

29

precept and/or charge for the courts with regard to sufficiency-of-the-evidence determinations. As the Fifth Circuit opined in *McCracken, supra*:

> Once raised, the question of the defendant's sanity will normally be for the trier of fact to resolve, but at three different points the court may face the question of the sufficiency of the evidence as a matter of law. Initially, of course, the court must always determine whether the defendant has presented enough evidence to put his sanity in question. *See United States v. Holt*, 450 F.2d 868 (5th Cir. 1971). The court must also determine whether the Government's evidence is sufficient to make an issue for the jury on the defense of insanity and thus avoid a directed verdict of acquittal. Finally, in the event of a guilty verdict, the court must decide whether the Government's evidence is sufficient to support the conclusion of the trier of fact as to the defendant's sanity at the time of the offense. *United States v. Collier*, 453 F.2d 1173, 1176-1177 (5th Cir. 1972) ; *Gordon v. United States*, 438 F.2d 858, 885 (5th Circ. 1971), *cert. denied*, 404 U.S. 828, 92 S. Ct. 63, 30 L. Ed. 2d 56 (1971) [.]

*McCracken*, 488 F.2d at 409.

¶72. *McCracken* went further with the following:

> This court has never precisely defined the quantum of evidence necessary to constitute sufficiency for each of these determinations, though the level obviously rises from the first to the third. Indeed exact quantification, even if possible, would probably be undesirable. Instead, through the painful process of case-by-case adjudication we have educed a set of general principles to guide both the trial court in exercising its role of weighing the evidence as a matter of law and the appellate court in reviewing that exercise. Foremost among these principles is the realization that "each [case] must be decided upon its own facts with careful attention to the weight of the evidence on each side." *Nagell v. United States*, 392 F.2d 934, 937 (5th Cir. 1968).

¶73. Likewise, this Court has never delineated the quantum of evidence necessary to constitute sufficiency for either the accused's or the State's evidentiary burden in such cases. Rather, this Court has held simply that the test as to whether an issue regarding defendant's sanity should be submitted to the jury is whether the acts and conduct of the defendant and

the opinions of the witnesses would be reasonably calculated to raise reasonable doubt in the mind of any of the jurors regarding the defendant's sanity. *Waycaster v. State*, 185 Miss. 25, 187 So. 205, 208 (Miss. 1939). We point out that the *Waycaster* Court said it is proper for the jury to be advised of this legal test under proper instructions as to the measure of proof required to support the plea of insanity in the light of the facts and circumstances testified to and the opinions expressed by the witnesses.

¶74. As mentioned, we agree that jury instruction S-8 could be interpreted by the jury to say that the burden of proving insanity lies with the accused. And the instruction also fails to inform that all that is required of an accused is to present sufficient evidence creating a reasonable doubt as to his sanity at the time of the act. But, although instruction S-8 imperfectly stated the law, we find that, when the instruction is read in conjunction with jury instruction S-4, the jury was adequately instructed. *See Hornburger v. State*, 650 So. 2d 510, 515 (Miss. 1995) (finding that where a jury instruction imperfectly stated the law, the instruction was harmless error when read with other instructions provided).

¶75. Jury instruction S-4 reads as follows:

> The [c]ourt instruct[s] the jury that if you find that the State of Mississippi has proved beyond a reasonable doubt all the essential elements of rape as set forth in Jury Instruction S-2, then you must find the defendant . . . guilty of rape, unless the State of Mississippi has failed to prove beyond a reasonable doubt that the defendant . . . was sane at the time the defendant committed the rape.
> In order to prove the defendant . . . was sane at the time he committed the rape the State of Mississippi must prove beyond a reasonable doubt that at the time of the commission of the rape the defendant . . . had the mental capacity to realize and appreciate the nature and quality of his actions and to distinguish between right and wrong with reference to the actions he committed.

If after considering all of the evidence in this case you find the State of Mississippi has failed to prove beyond a reasonable doubt that the defendant was sane at the time of the commission of the rape, then your verdict under Count I of the indictment must be not guilty by reason of insanity.

¶76. Instruction S-4 properly informed the jury the State–not Crawford–had the burden of proving the sanity issue. We find that the jury was adequately–although not perfectly–instructed. And we are convinced that Crawford was not denied a fair trial because of jury instruction S-8.

### IV. WHETHER CRAWFORD'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY A SEARCH OF HIS HOME BY LAW-ENFORCEMENT OFFICIALS WITHOUT A WARRANT.

¶77. Crawford contends that most of the physical evidence in this case was obtained through an illegal search and should have been suppressed. We find no merit in his contention.

¶78. In determining whether evidence should be suppressed, a trial court's findings of fact will not be disturbed on appeal absent a finding the trial court "applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence." *Simmons v. State*, 805 So. 2d 452, 482 (Miss. 2001) (quoting *Taylor v. State*, 733 So. 2d 251, 255 (Miss. 1999)). "As a general rule, our state and federal Constitutions prohibit searches without a valid warrant unless an exception applies." *Galloway v. State*, 122 So. 3d 614, 669 (Miss. 2013). Such exceptions typically include a consensual search, a search incident to arrest, an inventory search, and a search under exigent circumstances if probable cause exists. *Id*.

¶79. Here, we agree with the State that the search was legal as an emergency search under exigent circumstances. In such instances, three elements must be met: (1) there are reasonable grounds to believe that an emergency situation exists and that there is an immediate need for police assistance in order to protect life and property; (2) the primary motivation for the search is not to make an arrest and/or to seize evidence, and (3) there is some reasonable basis, approximating probable cause, to associate the emergency with the area or placed searched. *Baker v. State*, 802 So. 2d 77, 79 (Miss. 2001).

¶80. There is no dispute that the exigent-circumstances doctrine applied when the deputies first entered the Crawford's residence. Based upon information Nicole provided, the deputies reasonably believed Sue's life and safety were in danger, and their primary motivation for the search was to locate Sue. Both Crawford and the dissent authored by Justice Kitchens, however, take issue with evidence seized the second time deputies entered Crawford's residence and contend that it constituted an illegal search and seizure. We disagree.

¶81. In *Baker*, this Court, relying on *Taylor v. State*, 733 So. 2d 251 (Miss. 1999) and *Smith v. State*, 419 So. 2d 563, 570 (Miss. 1982), *overruled on other grounds* by *Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991), held that "when police are properly authorized to enter a dwelling under the exigent circumstances doctrine, they are also authorized to return and take physical evidence that was in plain view during the initial search, which they could have seized at the time but for the emergency situation that allowed them to enter the dwelling in the first place." *Baker*, 802 So. 2d at 80.

33

¶82. In *Taylor*, police entered a house in which a victim had been fatally burned by her boyfriend. *Taylor*, 733 So. 2d at 254. One officer walked through the house and then left briefly to search for the boyfriend. *Id*. The officer returned to the house with a camera to take pictures of the scene. *Id*. Approximately forty-five minutes later, police walked through the house a third time, collecting various pieces of physical evidence. *Id*. The *Taylor* Court upheld the search's constitutionality, relying and quoting from the reasoning this Court applied in *Smith*, as follows:

> From the time of their initial entry, the officers of the Jackson Police Department were engaged in only one search. That search had only one goal: locating [the victim] (and assisting her, if not too late). The actions of [the officer] and other members of the mobile crime lab (after the re-entry of the apartment) were merely to effectuate the physical seizure of articles in plain view which [the officers] would have been able to seize had not the circumstances been so "exigent." There was no unwarranted delay in time, nor was there any expansion of the scope of the search. The fact that the actual physical taking of the items into the custody of the police was effectuated by an evidence technician who was trained to preserve the evidentiary value of the objects, rather than by the first officers to view the objects, is not significant.

*Taylor*, 733 So. 2d at 256 (quoting *Smith*, 419 So. 2d at 572, *cert. denied*, 460 U.S. 1047, 103 S. Ct. 1449, 75 L. Ed. 2d 803 (1983)).

¶83. We find that the same reasoning applies here.

¶84. Deputy Gregg Hopper testified that when he, and Deputy Tommy Story, and Constable Leroy Dereck arrived at Crawford's residence, they all entered the house and made a quick pass through the entire residence looking for Sue. Seeing that Sue was not inside the house, they went to the back door, which was open. There, they noticed what appeared to be blood drippings on the steps leading from the back of the house into the yard. Hopper and

Story "started across the yard at the southeast corner of the house." Outside, they noticed footprints and a piece of duct tape on the ground with what appeared to be hair on it. Hopper and Story followed the footprints to a nearby abandoned house, which they searched and found neither Sue nor Crawford. Dereck, who had remained inside Crawford's residence while Hopper and Story followed the footprints, soon exited Crawford's residence and went over to the abandoned house. Hopper and Story returned to Crawford's residence, where they saw Crawford's grandfather, Dewey Crawford. Dewey provided Story with a description of Crawford's truck. Story got on the radio and relayed the information to a dispatcher. While Story was on the radio, Hopper went back inside Crawford's residence and "started collecting evidence."

¶85.    The first piece of evidence Hopper obtained was a tampon, which appeared to have blood stains on it. Hopper found the tampon laying on top of a bed located in the residence's front bedroom. Next, Hopper obtained a roll of duct tape, which he found laying on the kitchen table. Hopper also found strippings of duct tape with what appeared to be hairs on it. The strippings were located next to the roll of duct tape on the kitchen table. Hopper next took a quilt that covered the bed where the tampon was found. According to Hopper, it took them approximately thirty to forty-five minutes to collect all the evidence.

¶86.    On cross-examination, Hopper was asked why he did not obtain a search warrant before going back into Crawford's residence a second time. Hopper replied that this was an emergency situation. Sue was still missing and they had only a couple of officers available looking for Sue. Hopper said they did not have time to obtain a search warrant and did not

35

have anyone available to leave at the scene to watch the house until a search warrant could be obtained.

¶87. Very similar to the circumstances in *Smith*, from the time they first entered Crawford's residence, the officers had one ambition–locating Sue and "assisting her, if not too late." *Smith*, 419 So. 2d at 572. The actions of Hopper and/or the other two officers upon reentering Crawford's residence were "merely to effectuate the physical seizure of articles in plain view which the officers would have been able to seize" when they first entered Crawford's residence "had not the circumstances been so 'exigent.'" *Id*. There was no unwarranted delay in time when the officers reentered Crawford's residence, and "nor was there any expansion of the scope of the search." *Id*. The fact that the officers did not seize the complained-of items of evidence during their first entry of Crawford's residence, "is merely evidence of the exigency of the particular circumstances" of this case. *Id*. at 574.

¶88. Citing *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), the Kitchens dissent contends we are deviating from that Court's interpretation of the Fourth Amendment. and decreasing the protection Mississippi citizens enjoy under that amendment. Not so.

¶89. First, the *Mincey* Court addressed "only the scope of the primary search itself, and was not overruling by implication the many cases acknowledging that the 'plain view' doctrine can legitimate action beyond that scope." *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987). Second, the *Mincey* case is factually distinguishable from the case before us on nearly every facet. In *Mincey*, several officers entered an apartment

36

where a drug sale had been arranged. One officer charged into a bedroom, and gunshots were exchanged. The officer was hit and later died. The only other person in the bedroom was Mincey. Approximately ten minutes after the shoot-out, homicide detectives took over the scene. They conducted a four-day search of the entire apartment, which included opening drawers, closets, and cupboards and inspecting their contents, emptying clothing pockets, and pulling up sections of carpet. The officers inspected every item in the apartment and seized several hundred items of evidence. The Arizona Supreme Court upheld the search under a "murder scene exception." As we recognized in *Baker*, a unanimous United States Supreme Court rejected this broad "murder scene" exception to the warrant requirement. The Supreme Court, however, reaffirmed the emergency aid exception to the warrant requirement:

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. *Cf. Michigan v. Tyler*, 436 U.S. 499, 509-10, 98 S. Ct. 1942, L. Ed. 2d. 486 (1978). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States*, 318 F.2d 205, 212(D.C. 1963)(opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Michigan v. Tyler*, supra, 436 U.S., at 509-510, 98 S. Ct., at 1950-1951; *Coolidge v. New Hampshire*, 403 U.S., [443] at 465-466, 91 S. Ct., [2022] at 2037-2038[, 29 L. Ed. 2d 564 (1971)].

*Mincey*, 437 U.S. at 392-93. Consistent with this reaffirmation of the exigent-circumstances doctrine, the Supreme Court concluded its discussion with the statement that "[t]o what

extent, if any, the evidence found in Mincey's apartment was permissibly seized under established Fourth Amendment standards will be for the Arizona courts to resolve on remand." *Id*. at 395 n.9.

¶90.    On remand, the Arizona Supreme Court upheld, under the exigent-circumstances doctrine, the admissibility of the evidence observed in plain view by the homicide detective who responded to the scene ten minutes after the murder. *Arizona v. Mincey*, 130 Ariz. 389, 636 P.2d 637, 648-51 (1981). The court concluded that the homicide detective's entry into the apartment "was merely a continuation of the initial emergency entry" by other police officers in response to the shooting, and therefore, the homicide detective "could make plain view seizures . . . of evidence he observed in plain view." *Id*. at 649.  The Supreme Court denied Mincey's petition for a writ of certiorari to review this decision. *Mincey v. Arizona*, 455 U.S. 1003, 102 S. Ct. 1638, 71 L. Ed. 2d 871 (1982).

¶91.    Similarly, courts in other states have upheld the validity of seizures of evidence observed in plain view at a crime scene to which police responded under the exigent circumstances exception, even when there is some delay between the plain-view observation and seizure of the evidence and the seizure is made by different police officers than the ones who initially responded to the emergency. *See, e.g.*, *State v. Brock*, 327 S.W.3d 645, 684-85 (Tenn. Crim. App. 2009); *State v. O'Donnell*, 974 A. 2d 420, 421-22, 408 N.J. Super. 177, 178-79 (App. Div. 2009); *Wengert v. State*, 364 Md. 76, 771 A.2d 389, 394-401 (2001); *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646, 652-54 (1997); *Allen v. State*, 638 So. 2d 577, 578-80 (Fla. Dist. Ct. App. 1994), *rev. denied*, 649 So. 2d 232 (table) (Fla.1994); *State*

*v. Tidwell*, 888 S.W.2d 736, 740-43 (Mo. Ct. App. 1994); *State v. Spears*, 560 So. 2d 1145, 1147-51 (Ala. Crim. App. 1989), *cert. denied*, (Ala.1990); *Hunter v. Commonwealth*, 8 Va. App. 81, 378 S.E.2d 634, 635-36 (1989); *State v. Magnano*, 204 Conn. 259, 528 A.2d 760, 761-66 (1987); *State v. Jolley*, 312 N.C. 296, 321 S.E.2d 883, 886-88 (1984); *State v. Johnson*, 413 A.2d 931, 932-34 (Me. 1980); *State v. Anderson*, 42 Or. App. 29, 599 P.2d 1225, 1228-30 (1979), *cert. denied*, 446 U.S. 920, 100 S. Ct. 1857, 64 L. Ed. 2d 275 (1980); *LaFournier v. State*, 91 Wis. 2d 61, 280 N.W.2d 746, 748-51 (1979); *State v. Martin*, 274 N.W.2d 893, 896-97 (S.D.1979).

¶92.    Here, consistent with *Baker*, *Taylor*, and *Smith*, we find that the second entry into Crawford's residence constituted a reasonable continuation of the original exigent search. Therefore, we find no error in the trial court's decision to deny Crawford's motion to suppress the complained-of items of evidence.

## CONCLUSION

¶93.    The Tippah County Circuit Court's judgment of conviction of rape and sentence is affirmed.

¶94.    **CONVICTION OF RAPE AND SENTENCE OF FORTY-SIX (46) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN THIS CAUSE SHALL RUN CONSECUTIVELY TO THE SENTENCE IN CAUSE NUMBER LK-93-089 IN THE LAFAYETTE COUNTY CIRCUIT COURT.  APPELLANT SHALL PAY COURT COSTS IN THE AMOUNT OF $165.00 DUE WITHIN A YEAR OF RELEASE.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR AND CHANDLER, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND  KING, JJ.  KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.;  DICKINSON, P.J., JOINS IN PART.**

**COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., KITCHENS AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶95.    Crawford's central defense theory was insanity. Through his own testimony, and that of his mother and ex-wife, Crawford presented compelling evidence that he was legally insane. The State presented evidence to the contrary in rebuttal, setting up an important dispute of fact for the jury to resolve.

¶96.    But the jury was ill-equipped to do so because the circuit judge failed adequately and correctly to instruct the jury on the burden of proof related to insanity. The judge gave instructions which, when fairly read, stand in conflict with one another, and which, even when subjected to a stretched and contorted reason, are at best so confusing that no jury could adequately understand the law to apply it to the facts.

¶97.    So, because the judge's error precluded the jury from adequately considering Crawford's primary defense, I respectfully dissent.

**CRAWFORD'S EVIDENCE OF INSANITY**

¶98.    At trial, Johnnie Smith—Crawford's mother—testified that when Crawford was a child he struggled to sleep because he heard voices. So she took Crawford to a child psychologist or psychiatrist, who prescribed him medicine to sleep at night.

¶99.    Around age sixteen or seventeen, Crawford began to experience violent episodes. During those episodes, his personality would suddenly change. One minute he would be acting perfectly normal, then the next, he would be unable to control what he was doing. These spells would last anywhere from twenty minutes to an hour. Crawford would have a

blank glare, like he was in a daze, and his pupils would shrink to the size of pinheads. The spells were often preceded by a week or two of depression, during which time Crawford would not leave the house and would black out the windows. After the spells were over, Crawford couldn't remember what he had done.

¶100. Because of this problem, Crawford was confined to a mental hospital for thirty days in 1988 or 1989, then again in 1991, and he received mental-health treatment for two years from a psychologist, Dr. Hutt, who prescribed him lithium to control his episodes. He was diagnosed as manic depressive. Crawford's mother also testified that she believed Crawford's condition made him a danger, and that the problem had worsened with age. She considered him mentally ill and believed that he was having one of his spells the night of this crime.

¶101. Gail Crawford—one of Crawford's ex-wives—testified that her marriage with Crawford had ended because of his mental-health problems, and particularly because he would leave her and their child for weeks at a time. She described spells when Crawford would have headaches, wake up screaming and shaking in the night, and become violent.

¶102. She detailed a particular incident in which Charles starting crying and shaking, grabbed her, and began choking her, saying that she couldn't leave him and take his baby. She explained that they split up but got back together after Crawford had a stay in the hospital and was prescribed medication for his condition, but that he eventually stopped taking the medication. She also believed that Crawford's actions in this crime mirror his

actions during his prior spells. She explained that he often comes out of these spells apologetic and unsure of what he has done.

¶103. Crawford testified that he was being housed in the psychiatric ward at Parchman. There he received treatment from a psychiatrist, Dr. Stanley Russell. He explained that his psychiatric problems went as far back as he could remember. He explained that, in 1989, he had a six-weeks hospitalization, and that he was prescribed lithium and desyrel. He explained that he was formally diagnosed with manic depression, or bipolar disorder. He explained that he also was hospitalized in 1991 and was prescribed lithium and dicyclomine.

¶104. He also had received treatment from a private psychologist. He testified that one doctor told him that he showed no signs of faking his illness. He explained that the spells his family described have been happening as long as he can remember, but they have become progressively worse with age. He explained that the spells come with gaps in his memory, and that they sometimes are preceded by severe headaches and blurred vision. He also explained that he has had some seizures.

## ANALYSIS

¶105. At trial, the circuit judge granted jury instruction S-8 defining insanity over Crawford's objection. Both at trial and on appeal, Crawford's counsel has argued that this instruction improperly shifted the burden of proof to him. I agree, so I would reverse his conviction and remand for a new trial.

¶106. This Court has long held that the burden of proof in a criminal case never shifts to the defendant, and that the State ultimately bears the burden to prove that a defendant is sane at

the time of the crime.[9]  But this Court has also long explained that each defendant is presumed sane, and that no evidence of sanity need be offered unless the evidence produced at trial creates reasonable doubt as to the defendant's sanity.[10]  It is only then that the State need prove beyond a reasonable doubt that the defendant is sane.[11]

¶107.  Some of this Court's insanity cases, however, have begun their articulation of the *M'Naghten* test with the phrase "it must be clearly proved."[12]  For example, in *White v. State*, this Court stated:

> In Mississippi to establish the defense of insanity, *it must be clearly proved that* at the time of committing the act the party accused was laboring under such defect of reason from disease of mind as to not know the nature and quality of the act he was doing or, if he did know it, that he did not know it was wrong.[13]

The jury instruction at issue in this case mirrored that language.  It stated:

> THE COURT instructs the jury that the defendant, CHARLES RAY CRAWFORD, has raised the defense of insanity in this case.  The terms and concepts of "sanity" and "insanity" as used in the jury instructions and in this case are legal terms and concepts and not medical terms.

---

[9] *Williams v. State*, 205 Miss. 515, 527-28, 39 So. 2d 3, 6 (1949).

[10] *Cunningham v. State*, 56 Miss. 269, 276 (1879).

[11] *Id.*

[12] *M'Naghten's Case,* 8 Eng. Rep 718, 10 Cl & F. 200, 1 Car. & Kirw. 130 (H.L. 1843); *White v. State*, 542 So. 2d 250, 252 (Miss. 1989) (citing *United States v. McCracken*, 488 F.2d 406 (5th Cir. 1974); *Edwards v. State*, 441 So. 2d 84 (Miss. 1983); *Palmer v. State*, 427 So. 2d 111 (Miss. 1983)).

[13] *White*, 542 So. 2d at 252 (citing *McCracken*, 488 F.2d at 406; *Edwards*, 441 So. 2d at 84; *Palmer*, 427 So. 2d at 111) (emphasis added).

The legal test for insanity under the law of the State of Mississippi is referred to as the *M'Naghten* Rule. The *M'Naghten* Rule states: to establish a defense on the ground of insanity, *it must be clearly proved that* at the time of committing of the act for which the defendant has been indicted that the defendant was laboring under such defect of reason from disease of the mind as to not know the nature and quality of the act the defendant was doing, or, if the defendant did know the nature and quality of the act, that the defendant did not know it was wrong.

Stated more succinctly, the test for insanity is whether the defendant was unable to distinguish right from wrong at the time the act was committed.

The question of insanity is for the jury to determine. Furthermore, the jury is not bound by any expert's testimony and may accept or reject it in whole or in part.

The Court instructs the jury that even should you find that the defendant was suffering from a mental illness, an emotional problem, or some other condition or problem which could be classified as a "disease of the mind," *you may not find the defendant not guilty by reason of insanity unless you also find from all of the evidence in this case that the defendant's condition left the defendant unable to distinguish right from wrong at the time the act was committed.*

¶108. While this jury instruction mirrors language that has been used in this Court to describe the *M'Naghten* test, it does not conform to this Court's articulation of the burden of proof in insanity cases. The instruction clearly and improperly shifted the burden to Crawford. In *White*, in which this Court used the language mirrored by the instruction, the Court went on to explain thoroughly the burden of proof in these cases.[14] The Court stated that:

There is a presumption that an accused is sane and, therefore, the *burden is initially on the accused to introduce evidence creating a reasonable doubt as to his sanity* at the time of the act. However, once the accused has overcome

---

[14] *White*, 542 So. 2d at 252.

44

this initial burden, *it is the burden of the State to present sufficient evidence to prove the accused's sanity beyond a reasonable doubt.*[15]

¶109. While the defendant bears the initial burden to create reasonable doubt as to his sanity, the State ultimately bears the burden to prove that the defendant is sane. And there is a substantial difference between instructing the jury that the defendant must first create reasonable doubt, and that it must be clearly proven that the elements of *M'Naghten* insanity exist.

¶110. Said differently, it strains reason to say that this instruction merely referenced the initial burden the defendant bears to create reasonable doubt because the defendant need only create some reasonable doubt, not establish all of the *M'Naghten* elements. And it is equally unreasonable to say that this instruction never explicitly says the defendant bears the burden because, logically, only a defendant would endeavor to prove he is insane.

¶111. That said, jury instructions must be read as a whole to determine whether they adequately instruct the jury on the relevant law.[16] Jury instruction S-4 stated that if the jury found the elements of rape proved beyond a reasonable doubt, it must find the defendant guilty unless the State "failed to prove beyond a reasonable doubt that the defendant, CHARLES RAY CRAWFORD, was sane at the time the defendant committed the rape."

¶112. While this instruction properly placed the burden on the State to prove sanity, the instructions read as a whole do not adequately instruct the jury. Conflicting instructions do

---

[15] *Id.* (internal citations omitted) (emphasis added).

[16] *Williams v. State*, 134 So. 3d 732, 737 (Miss. 2014) (quoting *Clark v. State*, 40 So. 3d 531, 544 (Miss. 2010)).

45

not properly instruct the jury.[17] The majority opinion stands in stark contrast to this principle. Here, one instruction put the burden on the State to prove sanity beyond a reasonable doubt and another put the burden on the defendant clearly to prove insanity. "It is well settled that it is reversible error to give contradictory or conflicting jury instructions."[18] But today's majority concludes that conflicting jury instructions are of no concern because the Court assumes that the jury will select the correct one without any guidance to do so. So I respectfully dissent.

**KITCHENS AND KING, JJ., JOIN THIS OPINION**.

**KITCHENS, JUSTICE, DISSENTING:**

¶113. The right to a fair trial is firmly entrenched in both the United States and Mississippi Constitutions. U.S. Const. amend. VI; Miss. Const. art. 3, § 26. This right is inviolate. It is not contingent upon the severity of the crime, the personal character of the criminal defendant, or a court's desire for efficiency. The record in this case teems with significant encroachments upon Crawford's constitutional rights. I respectfully dissent.

¶114. I join Presiding Justice Dickinson's dissent, agreeing with him that the jury instruction regarding insanity improperly shifted the burden to Crawford to prove his own insanity. I write separately because most of the physical evidence in this case was obtained as a result of an illegal search and because, given the serious errors in this case and the inordinate

---

[17] ***Elam v. Pilcher***, 552 So. 2d 814, 817 (Miss. 1989).

[18] ***Id.***

46

amount of time that passed between Crawford's trial and this appeal, the trial court should hold a hearing on the issue of Crawford's right to a speedy appeal.

## I. ILLEGAL SEARCH

¶115. The majority of the physical evidence was seized by peace officers through an illegal search, in violation of the Fourth Amendment to the United States Constitution and Article 3, Section 23, of the Mississippi Constitution. Because the majority omits major, relevant facts related to the search, I shall recount them.

¶116. On April 13, 1991, Tippah County Deputy Sheriffs Greg Hopper and Tommy Story received a telephone call to the effect that a girl needed medical attention because she had been hit in the head. The girl was Nicole, Sue's[19] friend. Nicole told the deputies that Sue was with Crawford at his house. Deputy Hopper and Chief Deputy Story went to Crawford's residence. Chief Deputy Story provided the following testimony concerning the search:

Q: What did you do when you got to the residence of Chuck Crawford?

A: All right, we went to the door of the house. We knocked and shouted for Chuck and her. Nobody answered. At that time[,] his relatives came up and said, "Go on in and look for them;" and we went in the house.

. . .

Q: Did you find Chuck Crawford or [Sue] there at the residence?

A: No, we didn't.

Q: After you searched through the residence, what did you do next?

A: Once we went in and searched the residence, we exited at the back, went down the back steps . . . .

---

[19] *Sue* is a pseudonym adopted to protect the identity of the underage rape victim.

¶117. Deputy Hopper testified about the search as follows:

Q: What did you do when you got to the white house, and who else was there when you got there?

A. As we first got there, there was no one else there. We didn't establish that there wasn't anyone in the residence until we entered the residence and made a pass through the residence to check for [Sue].

Q. After you made the pass through the residence searching for [Sue], what did you next do, immediately next do at that point?

A. Well, we got to the back door; and the back door was open. As we went through the back door, we noticed what appeared to be blood drippings on the steps as you go down into the yard and starting trying to locate [Sue] or their whereabouts. As we started across the yard at the southeast corner of the house, we noticed duct tape, apparent duct tape with what appeared to be hair, hair samples on it. As we went across the garden, there was -- it had been raining. It was not raining at that time, and there was footprints that went across the garden and we searched the old abandoned house, and then we could tell where there had been a vehicle that had torn out very suddenly.

Q. Like a skidmark or spin out mark?

A. Yes, spin marks on the east side of the old abandoned house.

Q. What did y'all then do at that time?

A. At that time myself and Mr. Story were the two that crossed the garden and went to the old house. We went back and at that time Mr. Dewey Crawford, which is Charles Ray Crawford's grandfather talked to Mr. Story and give him the information on the truck and what type vehicle he would be driving; and at that time Mr. Story stayed on the radio while I went back into the residence and started collecting evidence.

Q. When you went back into the residence, what items, what physical items did you take into evidence from out of the residence?

. . .

48

A. The first piece of evidence that was taken was what appeared to be a tampon.

. . .

A. We had a roll of duct tape that had apparent hair fibers on it.

Q. And where did you find the duct tape?

A: The duct tape was in the kitchen laying on the kitchen table.

. . .

A: We also recovered strippings of duct tape that was on the kitchen table.

. . .

A. After getting the duct tape from the house, we then took the . . . quilt or blanket that was covered over the bed. . . .

¶118. During cross-examination, Deputy Hopper agreed that he did not find any evidence of Sue and Crawford's "being there at the time or any evidence of any crime being committed at the time." He also testified that he assumed that the home he searched was Charles Crawford's and that he received permission to search the home from Crawford's grandfather, Dewey Crawford.

¶119. Crawford's defense counsel twice objected to evidence gained as a result of the search of Crawford's home. Specifically, trial counsel contended: "Your Honor, we're going to object to him testifying about anything he found in that house unless it had been shown that he had permission to search or that he had a valid search warrant."

¶120. In response, the State argued that the sheriff's deputies "never *in essence*, left the residence." (Emphasis added.)

¶121. Tippah County sheriff's deputies first entered Crawford's house under exigent circumstances in a legitimate effort to find Sue, who was in danger, and Crawford. They left the house, abandoned their search, and obtained permission from Crawford's grandfather, from whom Crawford had rented the house for more than five years, to reenter the premises. They searched the house and seized a tampon, a roll of duct tape with hair fibers on it,[20] "strippings" of duct tape, and a blanket. These items were offered into evidence at trial by the State as proof of Crawford's guilt.

¶122. The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. The Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

¶123. Article 3, Section 23, of the Mississippi Constitution provides:

> The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.

¶124. A search occurs within the meaning of those provisions when the government enters a place where the person challenging the search has a reasonable expectation of privacy.

---

[20] The State sent the roll of duct tape and the duct tape "strippings" to the Mississippi Crime Laboratory. A crime lab technician performed hair microanalysis on the hairs contained on both pieces of duct tape. She testified that she was able to "match" the hairs on the roll of duct tape to both Crawford and Sue and that she was able to "match" hairs on the "strippings" to Sue. The technician's testimony was based on evidence seized by officers during an illegal search. It therefore should have been excluded from trial on this basis. *See also* Order, *Manning v. State*, No. 95-DP-00066 (Miss. May 10, 2013).

50

*Baker v. State*, 802 So. 2d 77, 79 (Miss. 2001) (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516-17, 19 L. Ed. 2d 576 (1967)). To protect this right, courts must exclude evidence obtained through warrantless searches absent an applicable exception to the warrant requirement. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). No exception to the Mississippi Constitution's and United States Constitution's warrant requirements exists in this case.

¶125. As this Court explained in *Moss v. State*, 411 So. 2d 90 (Miss. 1982):

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home — a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."

*Moss*, 411 So. 2d at 93-94 (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 682-683, 5 L. Ed. 2d 734 (1961)).

¶126. "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one 'jealously and carefully drawn' exception, recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006) (internal citations omitted).

¶127. In *Brown v. State*, 358 So. 2d 1004, 1005 (Miss. 1978), this Court said:

> Consent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over

property *not in the exclusive control or possession of the defendant* and where the defendant had no reasonable expectation of privacy.

*Brown*, 358 So. 2d at 1005 (emphasis added); *see also United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974); *Houston v. State*, 531 So. 2d 598, 602 (Miss. 1988); *Shaw v. State*, 476 So. 2d 22, 24 (Miss. 1985); *Haralson v. State*, 318 So. 2d 891 (Miss. 1975). Thus, whether a third party can give valid consent to enter and search turns upon his or her apparent authority over a property. The United States Supreme Court noted the following standard: "[D]etermination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)).

¶128. On multiple occasions, the United States Supreme Court has held that third parties, not having any apparent authority and possession of the property, cannot provide sufficient consent for searches. For example, in *Chapman v. United States*, 365 U.S. 610, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961), the Court held that a landlord could not consent to a search of a tenant's property. Moreover, in *Stoner v. California*, 376 U.S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964), the Court found that a hotel manager could not provide police valid consent to search an occupied hotel room.

¶129. This Court has held that Article 3, Section 23, of the Mississippi Constitution is similarly intolerant of third parties with no apparent authority who undertake to give consent

for searches.  In *Martin v. State*, 217 Miss. 506, 509, 510, 64 So. 2d 629, 630 (1953), this Court held that consent from a man's brother-in-law was insufficient to circumvent the Mississippi Constitution's warrant requirement.  Similarly, in *May v. State*, 199 So. 2d 635 (Miss. 1967), the Court held that a search was illegal when an incarcerated man's fifteen-year-old son unlocked the man's house's front door for the purpose of permitting officers to enter and search the home.

¶130.  Clearly, the consent exception to the Fourth Amendment's and Section 23's warrant requirements were not met.  The deputy sheriffs testified that they believed the home was occupied only by Charles Crawford.  The officers testified that they thought that the property was "in the exclusive control or possession of the defendant." *Brown*, 358 So. 2d at 1005. It therefore is obvious that the sheriff's deputies could not receive valid consent to search Crawford's house from anyone other than Crawford.  The record is devoid of proof that the sheriff's deputies had any reasonable basis to believe that the grandfather possessed any authority whatsoever to consent to the officers' second entry into Crawford's residence.

¶131.  The exigent circumstances doctrine provides another narrow exception to the Fourth Amendment's protection against searches conducted without prior approval by a judge. The doctrine recognizes that "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and *no time to secure a warrant*." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949, 56 L. Ed. 2d 486 (1978) (emphasis added). The doctrine has been applied where law enforcement agents fear imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 39-40, 83 S. Ct. 1623,

53

1633, 10 L. Ed. 2d 726 (1963), escape of a suspect, or grave danger to their lives or the lives of others. ***Warden v. Hayden***, 387 U.S. 294, 298-300, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967). Because the doctrine is an exception to the ordinary Fourth Amendment warrant requirement, the government has the burden of showing that the warrantless entry fits within the exception. ***United States v. Jeffers***, 342 U.S. 48, 51, 72 S. Ct. 93, 95, 96 L. Ed. 59 (1951). Finally, in applying the doctrine, an objective standard governs the reasonableness of law enforcement officials' belief that exigent circumstances have arisen. ***Terry***, 392 U.S. at 21-22.

¶132. The first time the deputies entered the house, the exigent circumstances doctrine applied. Based upon the information Nicole had provided to the sheriff's department, the deputies reasonably believed that Sue's life and safety were in grave danger. The deputies entered the house in an effort to rescue Sue. But they quickly ascertained that she was not there. The deputies then left the house to look outside and at abandoned properties near Crawford's home. During this investigation, the deputies found a tire mark where Crawford's car recently had spun out as he left the area. At the time the deputies first had entered Crawford's home they had good reason to believe that Sue was inside.

¶133. But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." ***Terry v. Ohio***, 392 U.S. 1, 25-26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). When Deputy Hopper reentered the house for the purpose of "bagging and tagging" evidence, a clear violation of the Fourth Amendment occurred. At that point, an exigency no longer existed with regard to Crawford's home; the officers had abandoned the search of

Crawford's house in order to look elsewhere. The United States Supreme Court has limited the exigency exception to circumstances in which there is "no time to secure a warrant." *Tyler*, 436 U.S. at 509. The evidence inside was not the type of evidence that would dissipate rapidly and there was no danger of its imminent destruction. *See Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) ("[T]here were no exigent circumstances in this case . . . . There was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant. . . . And there is no suggestion that a search warrant could not easily and conveniently have been obtained."). If one of the deputies had left the house to obtain a warrant and the other deputy had remained on the scene, the evidence would have been in the exact same condition when he returned with a search warrant. *Strange v. State*, 530 So. 2d 1336, 1340 (Miss. 1988) ("No exigent circumstances existed, as, again, three of the officers could have secured the premises while a fourth complied with the Constitution and obtained a warrant.") (citations omitted). Further, "[i]t is perfectly proper for law enforcement officials to secure an area to protect potential evidence while a warrant is being procured." *Carney v. State*, 525 So. 2d 776, 787 (Miss. 1988). Hopper testified that the officers reentered the house because they did not want to wait two to three hours for a magistrate to sign a warrant. He testified that "we needed to get the evidence so we could get back out and look for Mr. Crawford . . . ."

¶134. But the United States Supreme Court has expressly rejected an efficiency exception to the warrant requirement:

> [T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. The investigation of crime

55

would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law. For this reason, warrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.

*Mincey*, 437 U.S. at 394 (internal citations ommitted).

¶135.  The majority, relying on this Court's precedent in *Baker v. State*, 802 So. 2d 77, 79 (Miss. 2001); *Taylor v. State*, 733 So. 2d 251 (Miss. 1999); and *Smith v. State*, 419 So. 2d 563, 570 (Miss. 1982), finds that there was no Fourth Amendment violation because "the second entry into Crawford's residence constituted a continuation of the original search." But the United States Supreme Court never has allowed police to extend their entry into a dwelling based on the exigency exception to reenter a dwelling for the purpose of conducting a plain-view search, as happened in this case.  In fact, in *Mincey v. Arizona*, 437 U.S. 385 (1978), the Supreme Court rejected the idea that exigent circumstances gave police officers *carte blanche* authority to continue searching a suspect's dwelling indefinitely.  *Id.* at 393. Thus, although the United States Supreme Court has held that "the police may seize any evidence that is in plain view *during the course of their legitimate emergency activities*," *id.* (emphasis added),  it also has held that a warrantless search must be "*strictly circumscribed by the exigencies which justify its initiation*," *Terry*, 392 U.S. at 25-26, and that the exigency exception is limited to circumstances in which there is "no time to secure a warrant." *Tyler*, 436 U.S. at 509.

¶136. Moreover, the majority's reliance on the "plain-view" doctrine is inconsistent with the United States Supreme Court's precedent. The United States Supreme Court has held that:

> [T]he discovery of evidence in plain view must be *inadvertent*. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. *But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different.* The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as "per se unreasonable" in the absence of "exigent circumstances."

*Coolidge v. New Hampshire*, 403 U.S. 443, 469-70, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (emphasis added) (internal citations omitted). Thus, based on the logical premises of the plain-view doctrine which require discovery to be "inadvertent," the majority errs in allowing the sheriff's deputies to reenter Crawford's house for the purpose of conducting a "plain-view" search.

¶137. It is clear that the majority, in holding that it is permissible for police officers to reenter a premises after an exigency has ceased for the purpose of performing a "plain-view" search, deviates from the United States Supreme Court's interpretation of the Fourth Amendment and decreases the protection that Mississippi citizens enjoy under the Fourth Amendment to the United States Constitution. As a state Supreme Court, this Court is compelled by the Supremacy Clause to adhere to the United States Supreme Court's interpretation of the Fourth Amendment by not attempting to establish a lower standard of rights in Mississippi. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which

57

shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). In some instances, depending on the provision, the United States Supreme Court's interpretation of a constitutional right or standard can be considered as a floor, and our interpretation of a similar right under the Mississippi Constitution can create a ceiling, so long as it does not pose a conflict. *See California Federal Savings & Loan Ass'n. v. Guerra*, 479 U.S. 272, 280, 107 S. Ct. 683, 689, 93 L. Ed. 2d 613 (1987) (holding that a a state's pregnancy discrimination law can go beyond the requirements of the federal Title VII); *Downey v. State*, 144 So. 3d 146, 151 (Miss. 2014) ("[Supreme Court precedent] does not require Mississippi to follow the minimum standard that the federal government has set for itself. We are empowered by our state constitution to exceed federal minimum standards of constitutionality."). However, we are not allowed to abrogate or diminish clearly-articulated federal rights, as the majority does here.

¶138. Ultimately, Crawford's grandfather did not have apparent authority over the property whereby he could consent to the search and, after the officers had determined that Sue was no longer in the home, they returned for the express purpose of collecting evidence to incriminate Crawford. This was a clear violation of Crawford's Fourth Amendment rights. The fruits of the search, a tampon, a roll of duct tape, "stippings" of duct tape, and a blanket, should have been excluded from evidence at Crawford's criminal trial.

## II. SPEEDY APPEAL

58

¶139. Twenty-one years have passed since the jury returned a guilty verdict in this case, and we just now are reviewing this case on appeal. This amounts to a gross failure of our justice system and offends our time-honored traditions of justice and fair play.

¶140. When a state statutorily guarantees the right to a direct appeal of a criminal conviction, as Mississippi has, Mississippi Code Annotated Section 99-35-101 (Supp. 2014), the state must make that appeal satisfy the Due Process Clause. *Evitts v. Lucey*, 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). In *Lanier v. State*, this Court recognized that excessive delay in the appellate process may rise to the level of a due-process violation. *Lanier v. State*, 684 So. 2d 93, 97-100 (Miss. 1996).

¶141. The majority is correct in its assertion that, based on our decisions, relief for a speedy appeal violation is available only when this Court finds that there is reversible error on other grounds. In other words, "where no other reversible error exists, then the reversal on the grounds of a denial of a speedy appeal is inappropriate." *Lanier*, 684 So. 2d at 100 (internal citations omitted). Even so, it is apparent that there have been multiple reversible errors committed in this case, including admission of the unlawfully obtained fruits of the search of Crawford's residence. As such, it is appropriate to consider the merits of Crawford's speedy appeal claim.

¶142. This Court analyzes speedy appeal claims through a modified version of the speedy trial balancing test articulated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). *Lanier*, 684 So. 2d at 98 (citing *Rheuark v. Shaw*, 628 F.2d 297, 303 n.8 (5th Cir. 1980)). The first three factors of this test are: the

length of the delay, the reason for the delay, and the defendant's assertion of his right. *Id.*
The final factor, prejudice, considers:

> (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired.

*Lanier*, 684 So. 2d at 98 (quoting *Rheuark*, 628 F.2d at 303 n.8).

*A. Length of the Delay*

¶143. In *Lanier*, this Court found that a nine-year, eight-month delay from the filing of a notice of appeal to the completion of briefing raised speedy appeal concerns. *Id.* at 98. In *Henry v. State*, this Court characterized a four-year-long delay between the final judgment and the record's being filed with this Court as "a matter profoundly more disturbing than the errors alleged above." *Henry v. State*, 486 So. 2d 1209, 1214 (Miss. 1986). The circuit judge imposed Crawford's sentence August 6, 1993. More than twenty years have elapsed since that time. Crawford's first notice of appeal was filed November 9, 1998. More than sixteen years have passed since then.

*B. Reason for the Delay*

¶144. The record fails to disclose why Crawford's appeal has taken so long to reach this Court. The trial court, over the years, has appointed multiple attorneys to file an appeal on Crawford's behalf.

¶145. First, Crawford's trial counsel, James Pannell, never filed any post-trial motions or a notice of appeal. He also never withdrew as Crawford's counsel.

60

¶146. Two years later, after Crawford sent multiple *pro se* letters inquiring about the status of his appeal, the circuit court, in turn, appointed David Bell to represent him. Bell requested the trial transcript, moved for a judgment notwithstanding the verdict or for a new trial, filed a notice of appeal, and designated the record. After Crawford was granted leave to proceed *in forma pauperis* on November 30, 1998, Bell too disappeared from this record completely.

¶147. Then, after the circuit court had appointed Thomas Levidiotis as Crawford's attorney in an unrelated capital-murder prosecution and this appeal, on March 21, 2000, Levidiotis sent a letter to the clerk of the Mississippi Supreme Court requesting any appearance forms that had been entered in this appeal. After this request, Leviodiotis disappeared from the record. No progress occurred in the filing of Crawford's appeal until his present counsel began representing him in 2013.

### C. Assertion of Right

¶148. After the initial delay, Crawford began sending letters to check on this case's status in 1995. He also filed a *pro se* motion for counsel in December of 2013.

### D. Prejudice

¶149. *Lanier* articulates that the primary concern regarding prejudice is whether Crawford's defense will be impaired on remand. *Lanier*, 684 So. 2d at 98. The record is silent on this matter. At best, this Court can only speculate about the evidentiary problems caused by a twenty-one-year-long delay.

¶150. In *Lanier*, understanding that the record was not entirely clear on the matter of prejudice, this Court ordered that "since this Court has found other reversible error, Lanier

61

shall be allowed to raise the issue that his ability to defend himself has been prejudiced and that the State deliberately engaged in oppressive conduct."*Id.* at 100.

¶151. Thus, the length in delay of the appeal itself does not create reversible error. But because I would remand this case to the trial court on other grounds, I also would direct the trial court to hold a hearing to address the reason for the delay in Crawford's appeal and whether his defense has been prejudiced.

## CONCLUSION

¶152. I agree with Justice Dickinson that the insanity instruction in this case constitutes reversible error. I also believe that the majority of the physical evidence in this case was obtained through an illegal search of Crawford's house and that, on remand, the twenty-one-year delay in hearing this appeal likely created a bar to retrying Crawford for this crime. I respectfully dissent.

**KING, J., JOINS THIS OPINION. DICKINSON, P.J., JOINS THIS OPINION IN PART.**

**COLEMAN, JUSTICE, DISSENTING:**

¶153. Heretofore, when an attorney continued to represent a criminal defendant despite the existence of an actual conflict of interest, such continued representation constituted *per se* ineffective assistance of counsel and mandated reversal and a new trial. As more fully discussed below, today's majority overrules the precedent that so strictly safeguards the constitutional right to counsel in criminal trials. Because the majority would affirm Crawford's conviction in the face of the fact that his first attorney represented him despite the existence of an actual conflict of interest, I dissent.

62

¶154. In *Kiker v. State*, 55 So. 3d 1060 (Miss. 2011), a unanimous decision of the Court in which seven of the current members of the Court participated, the Court unequivocally held that when a criminal defendant is represented by counsel with an actual conflict of interest, it is *per se* ineffective assistance of counsel. *Kiker*, 55 So. 3d at 1067 (¶ 19). "In the absence of a knowing and intelligent waiver from [the defendant], prejudice is presumed. . . ." *Kiker*, 55 So. 3d at 1068 (¶ 23). For whatever reason, the strong rhetoric of the *Kiker* Court has been ignored today.

¶155. I readily acknowledge that the attorney's conflict of interest in *Kiker* presented itself in a different way. There, Kiker stood accused of murdering his wife; indeed, a deputy sheriff found him standing over her dead body with the murder weapon in hand. *Kiker*, 55 So. 3d at 1063 (¶ 2). Kiker contended his wife's death resulted from an accident. *Id.* at 1063 (¶ 3). To contest his contention, the state called a jailhouse informant to testify against Kiker. *Id.* at 1063 (¶ 4). The informant testified that Kiker had confessed to him that he had intentionally shot his wife in the head. *Id.* One of the two attorneys who represented Kiker also represented the informant, and the informant said as much on the stand during the trial. *Id.* at 1023 (¶ 5). Regardless, Kiker's conflicted counsel continued his representation despite having another client whose interests directly conflicted with Kiker's.

¶156. In the case *sub judice*, the conflict of Crawford's counsel is of a different type. William Fortier represented Crawford first in the instant case. He filed a motion to withdraw as counsel on February 1, 1993, in which he represented to the trial court the following, quoted at length given its importance to the instant issue:

On Friday, January 29, 1993, certain facts concerning the Defendant were brought to the attention of the Movant which totally and completely altered Movant's belief and trust in his client. Overwhelming evidence was presented at that time that his client, Defendant, Charles Ray Crawford had committed another heinous crime, the kidnapping of a young female for substantial ransom money. In addition, your movant would show that he has now learned that the defendant, on Saturday, January 30, 1993, viciously murdered this innocent young lady. Movant would show that all acts of the defendant now appear to movant to be coldhearted, calculated, and premeditated.

Movant would show unto the Court that he has searched the depths of his soul, and there is no way that he can set aside his prejudiced feelings now existing towards the Defendant in order to capably and properly represent the Defendant to the best of his ability. The Defendant's conduct constitutes pursuit of an objective which the lawyer considers repugnant and imprudent within the purview of Rule 1.16 of the Mississippi Rules of Professional Conduct, so as to allow movant's withdrawal as counsel.

Furthermore, pursuant to the requirements of Rule 1.6 of the Mississippi Rules of Professional Conduct, it was necessary for movant to cooperate with State and Federal law enforcement officials to try and prevent defendant from committing further criminal acts, and, therefore, further representation by movant of defendant would constitute a clear and distinct conflict of interest.

Fortier's grounds for requesting withdrawal indicate that he believed his client to be guilty of another, heinous crime and that his belief in his client's guilt rendered him unable to represent him. He indicates that he had begun working with law enforcement officials against his client. Finally, he represented to the court that his continued representation of Crawford "would constitute a clear and distinct conflict of interest."

¶157. Fortier filed the motion to withdraw on February 1, 1993, a Monday. The trial court did not grant the motion to withdraw until February 4, 1993, a Thursday. Had Fortier taken no action on Crawford's behalf during the three-day pendency of the motion to withdraw, I would be content to hold that his representation ended upon filing the motion and no error

64

occurred. However, Fortier *did* act as Crawford's counsel during the four days the motion was open. The trial judge held a competency hearing the same day that Fortier filed his motion to withdraw. The competency hearing was held for purposes of two separate criminal proceedings against Crawford – Cause Number 5779 and Cause Number 5780. At the time of the hearing, Cause Number 5779 was an aggravated assault case, and Cause Number 5780 involved the rape and kidnapping charges at issue here. From the hearing transcript, it is apparent that Fortier represented Crawford in both cases, and Fortier intended to offer insanity defenses as to both cases. At the outset of the hearing, the prosecuting attorney informed the Court that Crawford would now be charged with a third crime – capital murder.

¶158. The prosecutor continued by informing the Court that "a legitimate question has arisen as to whether the defendant is a [sic] presently competent to be able to assist his lawyer" at trial. According to the prosecutor, he conferred with Fortier, and Fortier agreed to join the motion for a mental examination at Whitfield. Fortier also addressed the Court – after he filed the above-described motion to withdraw – and indicated his agreement with the motion to have Crawford examined. Fortier said, "I think there is a serious question as to his ability to stand trial on these charges based on the acts *that have come to light over the weekend. . . .*" (Emphasis added.) The record indicates that the facts of which Fortier spoke at the hearing are the facts referenced in his motion that gave rise to the conflict of interest. Accordingly, I can draw no other conclusion than at the February 1 hearing, Fortier acted as Crawford's attorney despite the existence of a conflict of interest.

65

¶159.  At the end of the hearing, and after submitting his client to the mental examination, Fortier asked the trial judge to rule on his motion to withdraw as counsel.  The trial judge responded, "I'm going to hold that until I hear from the physician."  Later in the day of February 1, 1993, the trial court entered the order mandating that Crawford undergo a psychiatric evaluation.[21]  As noted above, the trial judge allowed Fortier's withdrawal three days later by order dated February 4, 1993.

¶160.  From my review of the above-described documents of record, it is absolutely clear that Fortier believed he could not loyally represent Crawford.  In *Kiker*, the Court wrote:

> "In all criminal prosecutions, the accused shall enjoy the right . . . to have Assistance of Counsel for his defence." U.S. Const. amend. VI. *See also* Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both. . . .") "[A]dept representation encompasses two broad principles: minimum competence and loyal assistance." *Armstrong v. State*, 573 So. 2d 1329, 1331 (Miss. 1990) (citation omitted).  Moreover, constitutional guarantees of due process of law require undivided loyalty of defense counsel. *Littlejohn v. State*, 593 So. 2d 20, 23 (Miss. 1992) (citing U.S. Const. amend. V); *U.S. v. Alvarez*, 580 F.2d 1251, 1256 (5th Cir. 1978) (*Porter v. U.S.*, 298 F.2d 461, 464 (5th Cir. 1962)).  See also Miss. Const. art. 3, § 14 ("No person shall be deprived of life, liberty, or property except by due process of law.").
>
> "Under our system of jurisprudence, if a lawyer is not one hundred percent loyal to his client, he flunks." *Littlejohn*, 593 So. 2d at 22.  Because "[l]oyalty is an essential element in the lawyer's relationship to a client," the Mississippi Rules of Profession Conduct prohibit a lawyer's representing conflicting interests without knowing and informed consent from the client(s). Miss. R. Prof'l Conduct 1.7 & cmt.2 If an impermissible conflict arises after the lawyer

[21] Without mentioning the conflict, a federal district court relied in part on Fortier's having signed off on the order in denying Crawford federal *habeas corpus* relief on his conviction for capital murder.  *Crawford v. Epps*, 2008 WL 5095993, *2 (N.D. Miss. Nov. 25, 2008). Although, as discussed below and held in *Kiker*, prejudice should not be a factor in the instant case, Fortier's signing off on the order played a role in the federal court's decision.

already has undertaken representation, the lawyer should withdraw from the case. Miss. R. Prof'l Conduct 1.7 cmt., 1.16. "Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

*Kiker*, 55 So. 3d at 1065-1066 (¶¶ 13-14). While the conflict of interest facing Fortier differs from the one that confronted Kiker's attorney, both manifestations call into question the loyalty of an attorney to his client. I am of the opinion that the *Kiker* Court's holding should apply to either.

¶161. Also, the trial judge erred in proceeding with the competency hearing and allowing Fortier to continue to represent Crawford – however briefly – without informing Crawford of the conflict. *Kiker*, 55 So. 3d at 1068 (¶ 22).

¶162. Two things are true. First, Fortier had a conflict of interest. Fortier represented as much to the trial court, and the trial court eventually allowed his withdrawal. Fortier found in himself sentiments toward his client that would not allow him to provide loyal, sufficient representation. Although, as the majority points out, other jurisdictions have drawn a distinction between conflicts in which an attorney represents multiple clients and non-multiple client conflicts, I consider the distinction to be one without a difference in the instant case where Fortier's loyalty to Crawford became compromised. Second, Fortier continued to represent his client, however briefly, despite the existence of the conflict. Pursuant to the *Kiker* Court's holding, here is where our discussion of the assignment of error should end. We should hold that Crawford *per se* received ineffective assistance of counsel, and we should reverse and remand. All remaining debate and discussion can concern itself

67

with only one thing – whether Crawford can demonstrate **Strickland** prejudice, which he is not required to do under **Kiker**.

¶163.  The majority recasts the choice we, as a Court, face as one between the test mandated by the facts found in **Cuyler v. Sullivan**, 466 U.S. 355 (1980), on the one hand and the **Strickland** test as applied by the Fifth Circuit in **Beets v. Scott**, 65 F. 3d 1258 (5th Cir. 1995), when in reality the **Kiker** holding is different from and stronger than either.  **Cuyler** involved a multiple-client conflict of interest, and the **Strickland** Court described it as follows:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice [than a case in which the defendant effectively had no counsel].  In **Cuyler v. Sullivan**, 446 U.S., at 345-350, 100 S. Ct., at 1716-1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest.  In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties.  Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.  Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, *e.g.*, Fed. R. Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.  Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above.  Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."  **Cuyler v. Sullivan**, *supra*, 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

**Strickland**, 466 U.S. at 692.  Accordingly, while **Cuyler** holds that prejudice is presumed in cases involving actual conflicts of interest, it just as clearly holds that the rule is *not* a "*per se*" rule and the defendant must still demonstrate that the conflict in question "adversely affected his lawyer's performance."

68

¶164. While I understand the *Cuyler* Court's requirement that the defendant must show an adverse affect on performance, and I do not believe such a requirement, if adopted by the Mississippi Supreme Court, would violate the constitutional right to counsel, I simply cannot find it in *Kiker*. In fact, the *Kiker* Court wrote, "Therefore, we find that Barnett was under an actual conflict of interest, and Kiker *need not demonstrate any specific prejudice* to his defense." *Kiker*, 55 So. 3d at 1067 (¶ 19) (emphasis added).

¶165. If a majority of the Court wishes to factually distinguish the instant case from *Kiker* on the basis that Fortier's conflict in representing Crawford was not a multiple-client conflict, then I disagree because, as I write above, the ultimate question under *Kiker* is whether the attorney's loyalty to his client has been compromised. So, while I believe the distinction, so-defined, to be one without a difference, I agree that it is a distinction.

¶166. However, the majority appears to be holding that either the *Cuyler* test or the *Strickland* test applies. I believe *Kiker* differs from both, and if the majority is intending to hold that, under any conflict of interest scenario, prejudice must be proved, (Maj. Op. at ¶ 64), then the majority should explicitly state that it is overruling or modifying the unanimous holding of the *Kiker* Court.

**DICKINSON, P.J., KITCHENS AND KING, JJ., JOIN THIS OPINION.**